Thank you, Your Honor. May it please the Court, my name is Jennifer Garcia. I am with the Arizona Public Defender's Office and I represent the petitioner appellant in this matter, Mr. Sansing. With the Court's permission, I would like to focus on two of the claims before the Court today and, of course, answer any questions you might have about the others. The two in particular that I'd like to focus on are the Arizona Supreme Court's finding that the ring error in Mr. Sansing's case was harmless and on the claim that this Court recently certified regarding the ineffective assistance of counsel with respect to Mr. Sansing's plea. Could I ask you, on the ring error, obviously it went through a number of iterations and then it ultimately came back that there is a harmless error analysis that is to be done. And of all the Arizona defendants that were affected by this, is he the only one left? He is the only one left, Your Honor, yes. The only two cases — Because what, Murdoch or whatever was granted relief, but — Excuse me. No, bless you. — then the Supreme Court denied cert on that ultimately. Is that correct? That is correct, Your Honor. The only two cases where the Arizona Supreme Court found that the error was harmless was in Mr. Murdoch's case and Mr. Sansing's. So this is the sole — Just to trace back the harmless error thing for a while, my understanding is that the harmless — the fact that harmless error applies at all and what the harmless error standard is, according to Murdoch and other cases, is that there is no clearly established Supreme Court law in this question. Is that right? What about Ayala? I would say that since the Murdoch decision, the Supreme Court, I think, has clarified in the Davis v. Ayala case that the proper way to evaluate — No, I'm not talking about that. Oh, I'm sorry. I'm talking about whether there is structural error or harmless error, first of all. Oh, no, Your Honor. There is no clearly established Federal law on that issue. Okay. And so what Murdoch did was essentially say it's left to the State. And so the reason why they concluded that there was — it was harmless error of some kind — let's leave that aside for a moment — versus structural error is because that's what the Arizona Supreme Court decided. I think that's right to some extent, Your Honor. I think they did spend more time on the structural error aspect, but Mr. Sansing's not arguing — Who is they? I'm sorry. I'm sorry. The Murdoch court did spend some time discussing whether that error was structural, but ultimately decided that — Well, I don't think they didn't. I thought they concluded that because there was no clearly established Supreme Court law, we — it was the Arizona Supreme Court that spent time, and it has some dissenters who said it should be structural error. Yes, that's correct. And then because the Arizona Supreme Court had decided to evaluate it for harmlessness — All right. But — and then — and this is the part I'm interested in, in terms of — I mean, there's a dispute between the parties as to what you're looking at when you're looking at harmless error, which really goes back to — and the Arizona Supreme Court is quite clear that what they're looking at includes some version of the mitigating factors. Yes. Very clear. As I understand it, it's not the weighing exactly. It's some evaluation of whether they exist and what their — and whether they're sufficient for leniency, but not — ultimately, the — the weighing is — can be for a judge. Is that your understanding? They — in the direct appeal opinion, in cases that are this — that are as old as Mr. Sansing's, they do what they call an independent re-weighing. In the second opinion in Mr. Sansing's case that had solely to do with the impact of Ring on his case, they did, to some extent, a different analysis. They didn't redo their independent — independent review. As to what they said they were doing with regard to harmless error, it included the mitigating factors. Yes. Yes. They discussed the aggravating factor and then said that it — they necessarily must — I believe they used that word, necessarily must consider the mitigation that was proffered. Oh. Okay. And then we get to this problem about Brecht and Davis v. Alaya and so on. Yes. And what's your position about that? I agree with Respondents that Davis v. Alaya has clarified exactly — In what way? I think it mystified. I don't think it clarified anything. I think that might be true, that it is — that it has mystified it. But I think when this Court said in Murdaugh that the State's harmlessness finding was essentially entitled to no deference by this Court, that Davis v. Alaya, I think — Isn't it Ayala? Am I wrong? Or is it Ayala? I'm sorry. I think it's Ayala. Ayala. Ah, yes. Okay. I might say it all three ways now. It's in my head. Ayala. I think in that case the Supreme Court did state — and I would agree that it's not entirely perfectly clear, but that — That is — Yes. And wasn't it perfectly clear that it said that you didn't have to do either the AEDPA or the Brecht one first, or both, you only had to do one, because they amount to the same thing? Yes, Your Honor. Why are we doing it twice as opposed to once? That's the part I think where it is definitely less than clear. It doesn't overrule Frey. Very clear. It's absolutely clear. It doesn't overrule Frey, and it doesn't — it talks about the AEDPA Chapman analysis and the Brecht analysis sort of together. But I think they do state that the State Court's harmlessness finding itself must be objectively unreasonable. Well, I don't think they do, but go ahead. Okay. Well, I'm happy if — Suppose they do. The harmlessness — If they do. What the harmlessness has to be is that a reasonable jurist would think beyond a reasonable doubt that no jury would have found this. Yes. All right. So you want to go back to the merits, then? Oh, yes. How does this play out? Yes, Your Honor. Assuming that, but putting the Chapman thing in it, because it tends to get left out. Yes. And or the Brecht, although I think it's the Brecht that governs. And, you know, certainly the — you know, the standard of whether — Also, isn't our case law clear that it's the Brecht that governs? Haven't we continued to apply Brecht? I believe so, Your Honor, yes. And certainly, I think — But the premise is it doesn't matter. I mean, the premise of Flyer v. Flyer is that it doesn't matter. So we shouldn't be spending a lot of time worrying about this. Yes. And, Your Honor, I think that — that, I think, is the crux of the issue here, is that I think regardless of which harmlessness standard you look at, whether it's Chapman or Brecht or the Ayala case, you know, however you put those together, the questions in Mr. Sansing's case is that the State court was objectively unreasonable in stating that no reasonable juror could have — could have found that Mr. Sansing deserved a sentence less than death. Isn't it a fair-minded jurist? A fair-minded jurist, yes, under Richter. Under any of those permutations, there — that was an objectively unreasonable finding. Okay. But let me — there were a couple of things that I heard in there that you're not claiming this is structural error. No. Okay. So under the — if Ayala did say that the Ninth Circuit was doing it wrong, did it not? In the context of that case, I believe that appears to be what they said. Okay. Even if we want to say — they didn't say the Ninth Circuit was right. Not clearly. Yes. So if — if you're — you believe that the correct standard, then, is that a fair-minded jurist as opposed to whether a rational jury could have found the facts differently? I mean, pre-Ayala, that was a better argument, was it not? It was. I think — But that was never the standard, because that's not the Brecht standard. That's not the Brecht standard. And also in — But that was never the standard. In Richter, Richter specifically also applies to cases in which there is no reason State court decision, and that's not the case here. There's very — obviously quite a bit of reason State court decisions on this issue. So I think looking at the ultimate question of harmlessness, that the State court made a finding that, beyond a reasonable doubt, that no — The ultimate oddity here is that — is that we're trying to figure out not what this jury would have done, because it wasn't a this jury, but what some other jury would have done. And the whole premise of Brecht, at least, is that we're looking at this jury. Well, there is no this jury. Yes, there is. So what we're really looking at is what some fact-finder would have found, because it doesn't really matter who the fact-finder — it's really whether some fact-finder in their right mind — whether it's beyond a reasonable — assuming the AEDPA standard, whether a reasonable jurors could think that some — that no jury in its right mind could have found in favor of Mr. Sansing on the record before the trial court. That's basically it. Yes. I would certainly agree with that formulation. If you do it the AEDPA way. If you do it the other way, which, to my mind, is more favorable to the government, the Brecht way, because there the burden is on the Petitioner to prove an actual prejudice, not simply what some jury in its right mind would have done. Yes. And because there is no jury here, this was a judge-sentencing case, I think that it would have to be the objective standard. I think Strickland is clear about, you know, when you're considering this, that you would look at an objective sentence, or I don't think this context would be any different. Well, this case, though, is a little different than many because — I'm not saying there are not other capital cases out there where a defendant has pleaded guilty and admitted certain facts as part of it, but that's kind of an unusual posture in terms of — so, I mean, because most of the Ring cases were — they had a jury determination of the guilt or innocence phase, and then the penalty phase was done by a judge, and then they came back. Here, you have a defendant pleading guilty, and you also have him admitting certain facts, which I think become a little more problematic to the defendant because some of the things that you would want to challenge that a jury might have done differently, he's taken them off — I know you're arguing for different reasons that he's not bound by it, but he took them off, like admitting certain consciousness of the victim, you know, those type of things. As to the guilty plea itself, Your Honor, the defendant in Murdaugh — Mr. Murdaugh also took a guilty plea. So that — All right. But could you get into the nitty-gritty of why you think that, on some standard that applies, there was, in fact — I mean, as Judge Callahan says, there were stipulations here. And for present purposes, they exist, right? For present purposes, yes. All right. So how could there be, on any theory, harms? There are a few — there are a few crucial areas here. First of all, the aggravation. The State argued three aggravators. The trial court judge only found two, and the Arizona Supreme Court vacated one in their first direct appeal opinion. So that leaves this case with a sole aggravating factor. But the sole aggravating factor has two pieces. It has two pieces. And the other one is heinousness, right? Heinousness and depravity, yes. But — Suppose you got somewhere in the cruelty. How would you get anywhere in the heinousness? There's still, Your Honor, a question of fact as to the heinousness and depravity, because the gratuitous violence finding by the trial court and the Arizona Supreme Court is — you know, includes the discussion of the violence that was perpetrated as part of the attack. But there's Arizona Supreme Court case law cited in the briefing that says that if a victim — if the medical examiner cannot identify which blow was in fact the killing blow, that a gratuitous violence finding is inappropriate. So the law governing gratuitous violence is definitely sufficient that a jury could have found differently on whether that — What about the rape, though? The rape itself would go under the cruelty. Why? Because cruelty specifically — You don't need to rape someone to kill them. The cruelty specifically involves the victim's pain and suffering, while the heinousness and depravity — Emotional pain doesn't count? It does, yes, certainly it would. Mental anguish falls under the cruelty prong. And not the heinousness prong? And not the heinousness part. The heinousness and depravity part specifically focuses on the defendant's state of mind. And the defendant's state of mind isn't relevant to the rape? I don't know that it's irrelevant to the rape, but it would not be part of the gratuitous violence. There's no evidence that Mr. Sansing raped the victim in part of the attempt to kill her. I think that that could go to the senselessness and the helplessness findings that the trial court made. What about tying her up and heading her over the head and making her unconscious and all that? Certainly that is all part of the decision-making about heinousness and depravity. But based on the case law about when a defendant knew or should have known that the violence was adequate to kill the victim, because the ME cannot identify the order of the blows or which specific — or the stabbing wounds, I'm sorry, or which specific one killed the victim, a gratuitous violence finding is inappropriate under the Arizona Supreme Court's case law. And in addition, the case law also states that senselessness and helplessness alone are not enough to support a finding of heinousness and depravity. So here, at a minimum, there is a question of fact. And with regard to cruelty, I mean, you spent a lot of time on the question of whether she was conscious at the time of the rape. There was certainly some evidence that she was. There was. Yes, Your Honor. But — and there was two stipulations, that she was — at least that she was conscious after he came back. Yes, Your Honor. There was the — There any stipulation that she was conscious at the time of the rape? There was a factual basis that stated she was conscious at the time of the rape. That was part of the guilty plea. Was it — did he say it was at the time of the rape? I thought he just said that when he came back. When he came back, yes, which was then when he raped her. Oh, right. But he didn't say that. I don't think he specifically said at the time of the rape. No. No. So was there any stipulation that she was conscious at the time of the rape? I don't — I don't believe that even the stipulation offered at sentencing specifically stated that exact fact. But there were some discrepancies in discussing when she was conscious. I don't think there is any stipulation that expressly says she was conscious while she was raped. The inference that she was — Well, I mean, the Arizona Supreme Court, on the ring of harmlessness, as I recall, concentrated on what happened when they tied her up and she was pleading for mercy and they hit her over the head and everything. Yes. Do you think that's all irrelevant? I absolutely do not believe that it's irrelevant. What I do believe is it presents a question of fact because, again, the Arizona Supreme Court case law about cruelty covers a wide variety of options. And often when — in cases where the defendant was not conscious at the time of the defendant was conscious or which blow was — you know, what occurred before or after the victim was conscious, the Arizona Supreme Court has specifically found that that is not sufficient to establish cruelty. So that's one of — No, but that's not the question. Here we have an earlier set of events, which is very hard to — the only explanation I've heard that you gave was that it was relevant to the robbery. But, I mean, why they had to tie her up and bound her and hit her over the head and all that to rob her doesn't seem sensible. I understand none of this is sensible. But, nonetheless, I mean, why isn't that connected to the murder sufficiently in itself that that's enough? Your Honor, I'm by no means trying to say that any of it makes sense or is logical because I think it's far from that. But I think the important question is how you establish cruelty under — How do you? And in Arizona, again, in an area that I would say is less than clear, but there is specific case law finding that when it is not clear when a victim lost consciousness, if they were not conscious at the time of the killing blow, or, you know, what happened when, that a — that a finding of cruelty is inappropriate. So certainly there is evidence here that the victim was conscious for at least part of it. The medical examiner testified that he found it unlikely that she ever regained consciousness. Yeah, but that doesn't prove anything. It was unlikely. It wasn't — It certainly — But that's not really the relevant question. Am I wrong that the — in the Ring opinion, the Ring version here — Yes. — the main reason they found cruelty was that no rational jury would find otherwise or no rational fact finder. Yes. It was because of the — before he went out to the truck, what happened? That's mainly what they were talking about. They do discuss that, yes. Primarily. I would say primarily. They also focus considerable attention on this — the statement of facts in support of the plea and also on the sentencing stipulation regarding her consciousness. When he came back. And — excuse me? When he came back. Yes. But suppose he just looked at the earlier stuff. If they just looked at the earlier stuff, I — Suppose we just looked at the earlier stuff. You — I — it is still clear from the record that there is a question of fact here. And that — What's the question of fact? The question of fact is when she became unconscious, which is certainly — But we know that she was conscious when she — — prior to the blows on the head. Right. But simply — I mean, the Arizona Supreme Court — But you're not arguing that we back all that out. No. I'm not trying to erase those. The key is what is sufficient. And the fact that the victim was conscious for part of the criminal transaction — as the Arizona Supreme Court explained, they really broke this into two areas, one of which was the attempted robbery and the other one of which was the murder itself. And they found those two things to be separate and have separate intent. And I think that — Well, that's true. But this part, I mean, doesn't seem to have anything to do with the robbery. The — I mean, the tying up and hitting her on the head and all that. The tying up. And, again, we're not disputing that that occurred. But the question is, what is sufficient evidence to satisfy the cruelty aggravator? And the fact that the victim was conscious for some portion of the crime is not itself enough. There has to be something more. I mean, that's essential to, you know, an imposition of a death sentence, is that it's a crime outside the norm. So the mere fact — I don't want to say mere fact because, of course, it was terrible. But the fact that she was tied up and restrained prior to the blows on the head would not necessarily be enough in and of itself to satisfy the cruelty aggravator. Can I ask you to move off of this point? Yes. Because I'm not persuadable on this. I mean, I just think the Arizona Supreme Court is clearly right that any reasonable jury would have found this aggravator to be present. So you don't lose if that's the case. So just move off of that and explain why the Arizona Supreme Court was unreasonable in thinking that whatever mitigation evidence your client put on the table just wasn't sufficient to overcome a pretty strong aggravator, I would say here. I would certainly agree that this case, that the sole remaining aggravator could be considered a strong one. I don't dispute that. But I think the difference here is, again, the way a rational or reasonable juror could have looked at the mitigation evidence in this case. And I think standing above all other issues is the Mr. Sansing's genuine demonstrated remorse and acceptance of responsibility in this case, in addition to the fact that Mr. Sansing repeatedly stated during the sentencing proceedings that he was not – I mean, he didn't question – I mean, he confessed. He allowed his family to turn himself in. He wanted to admit guilt sooner than he even did, but he had – I mean, he played guilty. He confessed to the police, too? He did, yes. And in his confession, what did he say about the consciousness? Oh, Your Honor, I don't remember that off the top of my head, but I can look at it and let you know. I'm sorry, I don't remember. But that wasn't really part of the record here? I don't think so. Because he played guilty, I think that the factual basis of the plea – It subsumed into that. Yes. That's what – I was just looking for that, because it seemed unusual if he – he didn't resist. The family, they sort of turned him in. He didn't resist the arrest. And so it seemed like he would have confessed, but I didn't hear anyone talking about it here. He went to see his sister, I think with the intent of telling her, and he wanted to speak to his mother before he turned himself in, according to her testimony. So when they called the father to try to track down the mom so he could speak to her, then the dad told them that he was going to call the police, and Mr. Sansing waited for the police, turned himself in, and then accepted all responsibility for this crime, and repeatedly stated how sorry he was, how remorseful, what a terrible act it was. I mean, this case is fairly unprecedented in my experience as far as the degree of acceptance of responsibility and remorse displayed by a defendant. And that alone is something that a reasonable jury could have found should result in a sentence less than death. In addition, the – But are we – but under – after Ayala and after the findings that we have of the Supreme – you know, after the opinions that we have, what deference do we have to do, they obviously heard all of that. You know, sometimes, sadly, and we see this, I mean, sometimes you can do something that it doesn't really matter whether you're sorry or not. It's too much. And I understand that. I believe, based on the record in this case, that that's not true here. The Arizona Supreme Court was objectively unreasonable, beyond disagreement by the jury. There was simply, beyond a reasonable doubt, no chance. Is that your primary submission is a remorse? Because, I mean, that's kind of hard to plug into the – I mean, what I have a lot of trouble with is, you know, what is the – what would be the jury's role here? Now, I suppose, at least under the Arizona Supreme Court standard, the jury would – could – part of the harmlessness analysis is whether a jury would have – I mean, the remorse that he had remorse isn't really debated, right? No. So the question would have to be whether they thought it alone was enough to counsel leniency. But not – but no one seems to think that the ultimate question of whether he gets the death sentence is part of this harmlessness analysis, is it? I think the question as to whether or not the mitigation was sufficiently substantial to car for leniency was what the Court was deciding. Okay. So, yes. Okay. But certainly the remorse alone is not at all the only thing I'm relying on. I think the other very strong part of the analysis here is the consideration of the G-1 mitigating factor about whether or not Mr. Sansing was significantly impaired at the time of the crime. And the trial court did find that Mr. Sansing was impaired, but not significantly, not enough to rise to the standard of the statutory definition. And that is certainly, again, a question of fact for the jury. There was ample evidence presented that the Arizona Supreme Court does not address regarding Mr. Sansing's drug use, even in the middle of the sequence of crimes in this case. I mean, he called the drug dealer and had the drug dealer come to the house and sell him crack while the victim was in the house before he actually killed her. And none of that is even mentioned in the Arizona Supreme Court discussion, even though it was presented to the trial court. So this is certainly a case where, again, like Murdaugh, where a jury could have viewed this evidence very differently than the Arizona Supreme Court did. In Murdaugh, this Court specifically discussed the Arizona Supreme Court's reliance on Mr. Murdaugh's post-crime actions in covering things up. And that doesn't really always – there's another way to look at that. It doesn't really make it any less heinous if someone calls for more drugs while someone's suffering. This is in consideration of the mitigating factor, though, of whether he was significantly impaired. So, again, no one is – no one is trying to undercut the severity of the crime here, but the question would be whether or not he was significantly impaired. And between the evidence proffered by Mr. Sansing's wife regarding his state of mind and his actions, the evidence regarding his ingestion of drugs the day of and during the crime, and his actions afterwards, including the next day when he sobered up and immediately took steps to turn himself in and express his remorse and deal with what he had done. Sotomayor, you want to save me time? Yes, Your Honor.  I did say you wanted to address one other question, and if you want to do that, I'll give you a minute in rebuttal. Oh, that's fine. Thank you. I will reserve my time. Thank you. May it please the Court, my name is Lacey Gard. I'm from the Attorney General's Office, and I represent the warden in this appeal. I'm happy to clarify the cruelty standard if the Court has any questions about that. What? I'm sorry? The standard for proving cruelty under Arizona law. Okay. Go ahead. And all it requires is a period of conscious suffering, either mental or physical suffering. So to answer some of the questions that you had for Ms. Garcia, the period of time prior to the moving the van, during which the victim was indisputably, there's no dispute that she was conscious, and the evidence establishes her, you know, asking the children for help and praying and begging, all of that is sufficient to warrant cruelty. And I agree with the Court's observation that the Arizona Supreme Court, in affirming that factor on the harmless error review, relied heavily on that pre-conscious or that pre-van moving period. So I think that the dispute, I think maybe there's — Does one have to view that as part of the murder, or is it simply — I mean, theoretically, that could have been the end of it, although I don't know how exactly, because he had her tied up there and had to do something with her. But does one have to assume that he was meaning to come back to murder her and that this was  Does that matter? I don't think it does, because — well, I don't think we have to assume what his intent was at that time, because the State court, the Arizona Supreme Court looks at the entire murder transaction and the totality of the circumstances to see if there is a period of conscious suffering during the murder transaction. And here I think we have — I think the record says several minutes of this prolonged struggle between the defendant and the victim during which she's speaking and expressing her. All right. So what about the mitigation? I understand that your legal position, your first legal position is it doesn't matter. Right. Does that remain your position? Yes, that Murdaugh was — But the Arizona Supreme Court thought it mattered. Yes. And what I think the Arizona Supreme Court was doing was, as a matter of State law, going beyond what Ring 2 required it to do. Did it say that? Well, not — no. In all candor, it didn't say that, but it did say — it does recognize throughout the Ring — the State court Ring opinion, Ring 3, that Ring 2 was limited to aggravating factors. At the end of the opinion, they mentioned that mitigation is also needed to impose a death sentence or a finding of no mitigation sufficiently substantial to warrant leniency. And they regarded it as another fact that was necessary to impose a penalty. Right. And I think the critical word there is impose, not to make the defendant eligible for. So — Well, that's a little bit of fine-cut English, I think. Well, I disagree, because I think Ring — if you read footnote 4 of the U.S. Supreme Court's Ring opinion, they specifically say that Mr. Ring had raised no claim with respect to the finding of mitigation or imposition of sentence. Oh, right. But this whole thing — this whole harmlessness thing is in the vacuum of the Supreme Court having told us anything about how you do harmlessness under Ring. Right? I mean, that's why we're — we have no clearly established Supreme Court law. Right. So, therefore, when Arizona now is filling in that vacuum and is telling us what it thinks the standard is, and it did, why are we supposed to do something else other than what it thinks the standard is? I think I look at the question a little bit differently than that. I think what's at issue is that there is a right to a Sixth Amendment under Ring 2, a right to a Sixth Amendment finding of aggravation, and that was the right that was violated here. So then the State court applies the Chapman standard. Well, in any event, this isn't what Murdaugh says, so we'd have to overrule Murdaugh, right? Right. Well, I don't know that you would have to overrule Murdaugh. We cited case law in our brief that if there's intervening authority — What's the intervening authority? Well, I think Glee v. Frost. I think Lopez v. Smith. I think White v. Woodall. I think the Supreme Court's recent emphasis that you can't expand its precedent in order to say that a State court decision is objectively — But there's — I mean, under our law about what three judge panels can do, Miller v. Gammeer requires that we have a head-on conflict, and we don't. Well, I think it is a head-on conflict in the application of AEDPA, because what Murdaugh says, they actually say, I think, in the opinion, something to the effect of we don't think that rings should be read as narrowly as the State is reading it. Well, my understanding is that what Murdaugh did is what — But is Murdaugh pre-Ayala? Murdaugh is pre-Ayala, and that affects the Murdaugh — the harmless error analysis, yes. Yes, because Murdaugh gave no deference to the State court harmless — But it doesn't affect this question, i.e., what substantively goes into the harmless error analysis, right? Right. That's correct. And as to that, my understanding of Murdaugh wasn't that it said this is the standard. It said this is the standard the Arizona Supreme Court is using in the vacuum of any clearly established Supreme Court law, so that's the standard. They said — effectively, I think that's what they said, and I think that was incorrect. It is the standard that the Arizona Supreme Court is using. Well, maybe I misunderstood your question, but I think what Murdaugh says is that because the Arizona Supreme Court went farther than Ring II required in doing its harmless error review, that — well, they — It may have gone less far because it didn't do structural error, but it did what it did, and the question is, in the absence of clearly established Supreme Court law, why don't we use it? Because I think that the clearly established Supreme Court law is Ring, and I think that when the harmless error review of the aggravating factors was completed, that the harmless error review of the Federal question was completed, and what remained was a review of really a State statutory violation. Because at that time, the statute had been amended, and there was jury sentencing on all questions. But they didn't say they were doing it because of a State statutory requirement. They didn't, but they're not doing it as a matter of Federal law because — or at least not for AEDPA purposes. Well, they thought they were. Well, but for AEDPA purposes, the Supreme Court has never extended or — and hadn't at the time and hasn't since then extended the Sixth Amendment right to mitigation or actual sentencing. Can I move you to a different part of the analysis, and I'll just tell you where I'm at? I don't agree with you on this Murdoch thing. I think we're bound by it. I do agree with you that the aggravator, there was plenty of evidence to satisfy that, and that any reasonable jury would have found that. What I'm on the fence about is whether the mitigation evidence is strong enough, and in some ways, I think your opponent is right, in some ways unique enough that we could say that the Arizona Supreme Court was unreasonable in basically saying that no right-minded juror could possibly have voted for leniency. I'm very much on the fence about that, and I'd like to hear you address why you think the mitigation evidence is just not of substantial enough heft to call for that conclusion. Of course. And let me just preface my statements by saying that, too, because under Davis v. Ayala, you do have to defer to the State court decision, you'd have to find that it's just not even debatable that it's wrong and no one could debate it. Can you explain to me? I mean, Davis says that Frye v. Plyler remains good law, and it says you don't have to do the — either the Edpid deference or the Brecht. You can do either one because they're the same. So why do you keep saying that we're supposed to do the — I mean, as I say, I think you're better off with the Brecht standard than with the Davis standard if you properly, which your brief did not, factor in that the standard has to be what a reasonable jurist would think a juror could do beyond a reasonable doubt. If you put that beyond a reasonable doubt in there, you must be better off with Brecht. But whichever one is true, how can you tell me that Davis, especially given our subsequent law, which applies Brecht and doesn't leave the Brecht version, it states as an equivalent or it agrees with Frye that it's an equivalent, and you're telling me we have to do something else? Well, I agree, first of all. I agree with you that Davis is not entirely clear in how the — Very clear. It says — it says in haec verba, you do not have to do both of them. You can do either one. Well, it says that Brecht subsumes Edpa, but it says that if there's a State court merits ruling, you have to defer to the merits ruling. But that's — It doesn't say that. It says that because they're the same, you can do either one. Well — And it says Frye remains good law, which clearly said you don't have to do the other  two. Well, it does, and I agree. I agree that — that ideally the Supreme Court someday will clear this out, but the way — or clear this up, but the way I read Davis v. Ayala is if there's a State court — All right. Well, look, if you want to do what the Davis — the Edpa way, do it, but do it with reasonable doubt in the middle of there, which your brief did not. Reasonable doubt as to — I mean, it has to be beyond a reasonable doubt. You have to put the Chapman standard into the — Oh, I see. The deference point. And your brief never did that. I see. Or hardly ever did that. Okay. I see what you're saying. Yes. Yes. So — Maybe just so I can understand your position, I'd like to sort of just get through it, let you get through it, and then we'll go from there. So what is the standard of review for the Arizona Supreme Court's, from your perspective, determination that ring error was harmless, and how much deference must we give the Arizona Supreme Court's decision? And may we determine for ourselves whether a rational jury could have found the facts called for leniency? So can you just tell me your position, and I'll let you do that without asking you any questions, and then — My position is — I disagree — I disagree that Brecht is more favorable, first of all. My position is that we — that you need to defer to the State court merits adjudication, and that you can only set that aside if it is objectively unreasonable, meaning that it is not debatable by fair-minded jurists. Now, my — So how does that determination compare to whether a rational jury could have found that the facts called for leniency? That's a different standard, is that — That's a different standard, yes. But it's also — But it's also not the Brecht standard. It's also not the Brecht standard. So let's just back that standard up. That standard is an actual prejudice standard, right? I agree with that. Right. So if that standard is wrong, it's not — it's neither the Brecht standard nor the AEDPA standard. Let's just leave it aside. Okay. Because it's not the standard. Okay. Okay. Then I guess — I'm sorry. I violated and I didn't let you finish, so go ahead. No, that's fine. I think I had — I think I had finished. I think AEDPA applies. Well, in terms of the district court's decision, that was Judge Bolton, I believe. Yes. Is there anything — Now, she did not have the benefit of a YALA. I think a YALA was after that. But is there anything in her decision that you disagree with or that you think is inconsistent with a YALA? No. My memory of her decision was that she just focused on the aggravation. It was before Murdaugh. And I think that — I think she did the analysis right. Frankly, you know, my position is that's what — that's all you look at. Could you just answer my question? Yes, I can. Thank you. To answer your question, you know, I understand Ms. Garcia's point. I agree with her in some extent that it's unusual that a defendant would take responsibility. And Judge Reinstein, in fact, found that Mr. Sansing had genuine remorse. However, the aggravating factor in this case was extraordinarily weighty. And aside from his remorse and responsibility, there's really not much weighty mitigation here. Okay. But let's just — let me also say this. I agree, I think, with your position that the Arizona Supreme Court was entitled to say that the statutory mitigator, the — what is it, G1? G1. Can't keep these numbers straight. That there wasn't enough evidence to meet that. But there's clearly — his drug use obviously played a very significant role in his involvement in the crime, right? So you have that as a given. I think a jury could give quite a lot of weight to his wife's — I guess they're still married — his wife's statement that on this day, he was — that was not my husband. Okay? I've done drugs with him a million times. And I'm telling you, that day, for whatever reason, the man I — when I came home from work, the man I saw there, that was not my husband. He was in some other place. So I put that together with the obvious role that the drug use played in his commission of the offense. And I just wonder, why wouldn't a jury be able to say, look, maybe this was aberrational, right? I mean, maybe this guy isn't the epitome of evil that his acts seem to suggest he is. Maybe for whatever reason, he was just in, you know — do you know what I'm saying? That seems to me a totally reasonable reading of this record. And I guess I need to hear something more from you on that point. Well, I agree with the Arizona Supreme Court's finding on that, that that is undercut by his actions in planning and in concealing his activities, which show that drugs weren't really, you know, completely driving him, that he still had control over his faculties enough to prevent himself from being captured. Okay. Yeah, yeah. And that's why I was trying to take off the G1 mitigator. That's why that's not satisfied. But from a non-statutory mitigation standpoint, it seems to me it's quite compelling, no? But that's also — even though — even though that's — so that's the — the G1 mitigating factor can't be established if you don't have that kind of explanation relationship. Well, I said put that aside. Right. But the non-statutory mitigation, the weight of it can be affected also by the fact that it doesn't explain what his actions were. And here I think, you know, the question is would a reasonable jury have given weight to — or given significant weight to that kind of evidence when he's — Well, is the planning that you're talking about the planning to rob her? Yes. Because he clearly did plan to rob her. And luring her there. But what about the rest of him? Well, he lures her there to the residence. Right. He lures her there. He plans to rob her. And then all of a sudden he starts doing things that are completely counterproductive to trying to rob her, actually, and then — and murders her. And what is — is there any evidence that he planned to murder? I don't recall. I don't believe that there is evidence that he planned to murder her. No. I don't think so. And then they say, well, but he tried to cover it up. Well, he sure did a crazy job of it if that's what he was trying to do because he left her in her back — in his own backyard quite visible and left the car right nearby. So that's not exactly evidence of somebody who's in a state to commit a rational crime. And then as soon as he sobers up, he goes and turns himself in, essentially. Right. Well, he also lied to — when people called the house, when the church called the house looking for her, he lied and gave a false address to throw them off the trail. At what point was that, by the way? That was, I believe, after the murder, I believe. Well, yeah, the church was looking for the worker. Yes. Because that — but let me — I guess on the standard of review and what I looked at what Judge Bolton did, too, and in looking at the Arizona Supreme Court in terms of — it seems to me that they evaluated and made certain findings about what a rational jury could have found. Right. So then it seems to me, when you get to our level and you have to apply AEDPA, that we don't ask that same question, that we're asking the question of a fair-minded jurist, whether fair-minded jurists could disagree on that point. All right. So incorporated in this, I'm concerned that after Ayala and even the pre-Ayala, when — and if I look at that with the district court, how the district court was analyzing it, that there has to be some deference to what the findings of the Arizona Supreme Court were. And it seems that they made the rational jury analysis, and then we're looking at it through a different lens. How does that agree or disagree with your — That seems correct to me. That's what I was, I guess, trying to say before, that, you know, you are answering the question, could any rational — or was it objectively unreasonable for the State court to apply Chapman the way that they did and to make the findings that they made? And if it wasn't, if those are at least debatable by the record and — Well, the Arizona Supreme Court didn't make any findings. There were no facts. It's not a fact finder. Well, they made — I disagree. I think they made some factual findings on cruelty and — How could the Arizona Supreme Court make factual findings on harmless Ayala? Well — As to this question, which wasn't before the trial court at any point. Well, then maybe it's more appropriate to say that they incorporated the sentencing judge's findings or, you know, they made — they had to make some findings — But the one thing they can't do is incorporate the sentencing judge's findings because the sentencing judge should have been the sentencing judge. Well, that's true. But they had to make — Yeah. They had to make some findings in order to determine, in particular, on the aggravation, in order to determine whether the aggravating factor would have been found to be proved by a reasonable jury. So I think they had to resolve some — These have to be legal judgments. They're not findings. How does the stipulation in the guilty plea and all of that, how does that play into what can be revisited at this point? What can be revisited? Well, I think counsel for the petitioner is arguing that there are still issues that need — factual issues that needed to be resolved by the jury. How does that play into what he stipulated to? Because there — I think she's arguing that there are certain things about the consciousness, there are certain — that still have to be decided. Right. Well, and that goes back to my prior argument that I don't think that it — post-van-moving period, which I don't — I disagree that there is, but to the extent there is, I don't think it really matters because we have the undisputed pre-van-moving period. Also, he did admit on two occasions that she was conscious when he came back. And the record really isn't, aside from his admissions, really isn't that ambiguous as to whether she was conscious, because Kara Sansing said that she was, even though she initially testified differently than she had previously told police, but was later impeached with that statement. And the medical examiner said that he doubted that she would be conscious, but it wasn't impossible. So I don't think there's really a dispute to be resolved on the record with respect to cruelty, a relevant dispute at least, or a dispositive one. Can I just bring you back to the one thing that's troubling me? So I'm 100 percent on board with your reading of Davis v. Ayala, and I'm certainly willing to grant deference to the Arizona Supreme Court's judgment that no jury in there, no juror, because it's just even a single juror, no single juror would be moved enough by this mitigation evidence to vote for leniency. And I guess I'm just wondering, how do you make that prediction? What are you relying upon? Do we have empirical evidence that says when 12 random people are exposed to this kind of mitigation, nobody thinks it counts for anything? It's such an abstract kind of moral judgment that we ask jurors to make, and that's why I struggle so much with trying to figure out, is the Arizona Supreme Court objectively unreasonable here? So I'm just wondering, you seem so confident that, yeah, not a single juror would have been moved by this. What are you relying upon to make that predictive judgment? Well, I'm relying primarily on just the qualitative balancing like the Arizona Supreme Court did with the mitigation and the aggravation. But to that point, I think that that's another reason why, and I get the sense the Court disagrees with me about Murdaugh, but I think that's another reason why this assessment shouldn't even go into mitigation, because the aggravation is the factual question. Well, that's your on-bank petition, but we're stuck. I know. I understand that. But I think it's relevant to answer your question because, you know, the assessment of mitigation is inherently subjective. So from that perspective, I — Well, if the standard is no fair-minded jurist, all right, if we don't agree amidst ourselves, is there a fair-minded jurist within the three? Can you say the question again? Well, under the EDPA review, no fair-minded jurist, right? It's not what a rational jury. Right. All right. If we don't all agree — Then it's debatable, and this decision must stand, I would think. All right. Well, that's what I'm asking you. Are we three fair-minded jurists, or — I would think so, and yes. And I think that if it's debatable among fair-minded jurists under EDPA, it has to be affirmed. Can I switch gears a fair amount? A lot. It would be helpful to me if you quickly addressed the Anthony McKinney problem, which your opponent did not, but it seemed to me that the — not the trial court, which, you know, it seems to me there is a read of what he did that says he did consider these factors in some way, but the Arizona Supreme Court, both in its first opinion and its second opinion on the ring harmlessness, stated unequivocally that with regard to the family background issue, for example, that it couldn't count unless — under Arizona law, unless it had to do with the crime, unless it was a causation factor for the crime. Didn't it? Well, I disagree. I disagree with that. It didn't say that? Well, no. You can't disagree that it said it. You have to disagree that it was dispositive or something, because it did say it. Well, to start with the ring opinion, I think in both opinions, actually, they're talking about the lack of a causal link in terms of weight. And I agree that in the first opinion they did cite some of the cases that were found to be problematic in McKinney, including the Wallace case. But when you read the opinion as a whole, and I'd like to — I found a 28J letter citing Greenway, which says that you still have to look at the individual language in each opinion to determine whether there was Eddings error, and we can't just rely on the time period during which McKinney found that there was a causal nexus test applied. But if you look at the first opinion, the Court does cite those cases, but then says that the sentencing judge gave the evidence appropriate weight, and he did give it some mitigating weight, but not significant mitigating weight. So McKinney, as I understand it, says that there was a causal nexus test in place, that if it was — if the mitigation didn't pass that test, it was deemed irrelevant and couldn't be given any weight. So here, the fact that there was weight given in the first opinion, I think, defeats any McKinney problem. The second opinion, the Ring opinion, I think, is much farther removed from McKinney. It doesn't have any of the, I guess, the — Kagan. Well, let's go back to what the Arizona Supreme Court said in its first opinion. Yes. Arizona law, quoting Girff, Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. Right. And those are the problematic McKinney cases. But then at the end, it says the sentencing judge properly considered the evidence and gave it appropriate weight. And he had — Right, because the appropriate weight, according to them, was no weight because it's not relevant unless he can establish that his family experience is linked to his criminal behavior. Well, I think they're incorporating his ruling on that, and Judge Reinstein gave some weight to that evidence. He said he's not giving it significant weight. And they also say no testimony suggested that the defendant's childhood affected his behavior on the day of the murder. That's correct. The evidence on this subject did not prove a loss of impulse control or explain what caused him to kill. So they went on and on about that. That's correct. That's correct. But they're not — they're still giving it some weight. Well, it's kind of a fine line because it's sort of like if, let's say, you had a really bad — they put on evidence that you had a bad situation at the dentist. Okay? And the court listens to it and then just says, I don't really see how I'm hearing it. I'm listening to it. I'm not saying it — but it just doesn't change — it just doesn't seem to figure into why you committed this particular crime. I think the McKinney problem is just like saying out of hand, I am never going to look at — but you have to necessarily, when you admit something, you have to — how much weight you give it has to somehow take into effect how relevant it is to what happened. And if it's completely — it just doesn't seem to have any value to explain with that. It doesn't mean you didn't consider it. It just means at the end of the day, it's not going to make a difference. That's correct. That's right. And even after the post-2005 period where McKinney says Arizona started doing it right, they still apply that standard that if mitigation doesn't explain the offense, it still has to be considered, of course, but it's entitled to very little weight. Well, what it means that it has to be considered, as I understand it, is that a jury would be entitled to say, all right, this isn't why he committed the crime, but he had such a miserable life that, you know, just in general, and terrible things happened to him, and therefore we think he shouldn't be put to death even though he did this terrible crime and this wasn't the cause of it. That's the concept of Eddings, as I understand it. Yes. Yes. And that seems to be the concept that's being rejected here. Well, but... But they say it's not relevant. Not relevant seems to mean it's not, there is no chance it can matter. Right. I agree they cited that, but then I think that there's no Eddings problem because at the very end of the paragraph they give weight. I might suggest that McKinney error or Eddings error is susceptible to harmless error analysis. I don't think there's a very compelling argument in the second ring opinion. I understand they talk about a causal link in that opinion, but they don't have the same citations to the problematic cases from McKinney in the ring two opinion, and in that case they talk distinctly about weight again. I would submit that when you're looking at the harmless error question, if you get to that point, if you disagree with me and you find McKinney error, I think that the ring two or the Sansing two opinion should weigh in the analysis as to whether there's harmless error because that opinion tells us what the Arizona courts would have done, assuming there was a causal nexus error in the first one, that they still are not giving weight to the mitigation. And also I would submit... The second Sansing opinion was still within the period that were before the Arizona Supreme Court definitively said we were doing it wrong and now we're going to do it right. That's true, yes. But, and I would direct you then to also, and I understand it's a different issue, but I still think it's relevant to the harmless error. I would direct you to the Rule 32 opinion by Judge Jones, who made the same finding based on even a more enhanced mitigation profile, that this would not be enough to warrant a life sentence. And that was done well outside of the time period. But again, you know, under Greenway, the time period just isn't, it's not dispositive. You still have to look at the language of the case. If the Court has no further questions. Thank you. Thank you. Thank you very much, Rosie. You're smart. Just a few quick points that I'd like to clarify. First of all, the Greenway opinion is not the same as what we have in this case as far as the McKinney error. The important thing in the Greenway opinion was that the Court made no mention of a causal nexus at all in that opinion. There was no evidence that one was applied. They didn't even say the words causal nexus in that discussion. However, when you look at the Arizona Supreme Court's 2003 discussion here, they specifically state that there is no causal nexus. So even though they're not citing the same cases they had cited in their previous opinion, they're clearly not establishing any kind of a break with that, the findings. And certainly there's nothing about the time period that has changed from between the 2001 and 2003 opinion. They don't disavow their previous discussion of the mitigation finding no causal nexus. So certainly the fact that the mitigation that was present at the time of the Ring harmlessness opinion was discounted based on the lack of a causal nexus is another factor that this Court should consider when deciding whether the mitigation could have beyond a reasonable doubt, the Court could say that no reasonable juror would have sentenced Mr. Sansing to something other than death. In this case, we have the dispute about the drug evidence. And just like in Murdaugh, when discussing the steps that were taken during the crime, Judge Berzon, as you noted, a lot of the actions that Mr. Sansing took were nonsensical based in the light of what had actually happened, who knew what happened, the actions he took to cover up the crime. The main difference, I think, between this case and Murdaugh as to the drug issue was that there was no expert testimony here. Yes, Your Honor. And that is addressed in the ineffectiveness claim, which I think is the second claim in the brief. I know. For present purposes, that doesn't matter. Exactly. That's — So what we have is his wife's observations about how he was behaving. Yes. His estimate about how the dollar value of how much cocaine he had taken, which is meaningless to me. I don't have a clue as to whether how much cocaine, $450 or $2,000 worth of cocaine is. I agree, Your Honor. So I don't know why anybody else would. And, you know, some objective view of his behavior. I think it would be bad if we admitted otherwise. Yes. I think that's probably true, Your Honor. And I will agree that I think that the — especially considering how long ago this crime took place, it is hard to quantify. I think if, you know, again, looking at the post-conviction proceedings, as Ms. Gard had suggested as analogous, there was a drug expert that was used there. And his statement was that the drug quantity didn't matter, that it was the effect it had on Mr. Sansing. Yes, but as to the effect it had on Mr. Sansing, all you know is what Mr. Sansing said, what he did and what his wife said. And what his wife said, yes. And I would also say the evidence that was gathered regarding the crime. I mean, we do know he moved the truck only a few blocks away. You know, we know he put her body in the backyard in plain sight. I mean, the actions that he took really were not the result of some sort of logical or well-thought-out plan. And I think that in itself is analogous to that discussion in Mr. Murdoch's case. And in addition, one other factor is that the Arizona Supreme Court omitted any discussion in the Ring harmlessness opinion about Mr. Sansing's low IQ. It did talk about his lack of education, but low IQ was another factor that was presented to the trial court. And the record reflects that a motion for reconsideration was filed regarding the omission of that factor. And of the four justices that were partaking in the decision of that, the fifth justice was then-Justice Hurwitz, who argued Ring before the United States Supreme Court. So he recused himself. And at that point, one of the other judges changed sides, and so it was a 2-2 split. And based on that, the motion for reconsideration was denied. So at least another justice of the Court agreed that the evidence- Sotomayor, I mean, most likely that was a resuscitation of the issue about whether it was a structural error or a nonstructural error. The issue was the fact that the evidence regarding his low IQ had not been considered in the opinion. That was the issue that was in the motion for reconsideration. In the motion for reconsideration, yes, Your Honor. So that is another. So I think when you look at the fact that, you know, between the drug use, Mr. Sansing's lack of education, his low IQ, you know, the evidence that was before the trial court regarding those things, in addition to the information about his drug use, those are all things that a reasonable jury could have decided were warranted a sentence less than death. Kagan. Your time is up. Thank you so much. Thank you. Thank both of you for a really useful argument in a difficult case. I would also like to compliment both of you on your argument. These are really difficult cases, and you both showed a great understanding of the law and the facts, and I think argued very professionally. It's really easy in these cases to get upset, and it isn't always helpful to the court. And I think that you both really did an excellent job on that. Thank you so much, Your Honor. Thank you very much. The case of Sansing v. Roy is submitted. All rise. This court, for this session, stands adjourned.
judges: Berzon, Callahan, Watford